

L.P. Champ and L.J. Ammerman
(Wife and Husband)
7000 N. 16th Street
Suite 120-300
Phoenix, Arizona 85020
Tel.: (602) 524-2776
Tel.: (602) 625-1034
pc-ra@cox.net

*In Pro Per*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| L.P. CHAMP and L.J. AMMERMAN, wife and husband, <br><br> Plaintiffs, <br> v. <br><br> Michael Jung and Jane Doe Jung; husband and wife; Rudolf Meroni and Jane Doe Meroni, husband and wife; McKinsey & Company, a New York corporation, <br><br> Defendants. | Index No.:  CV-16-2168-PHX-ROS <br><br><br> **COMPLAINT** |

Plaintiffs, for their cause of action against the Defendants, allege:

**I.  Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. §1332.  Jurisdiction is proper in this Court since Plaintiffs are both citizens of the State of Arizona and were at all relevant times herein.  Defendant McKinsey & Company is a domiciliary of the State of New York; Defendants Jung are citizens of Germany; Defendants Meroni are citizens of Switzerland.  Defendants caused events to occur within the jurisdiction of this Court out of which this matter arises.  Diversity of citizenship exists between and among the parties and the amount in controversy exceeds $75,000.  Jurisdiction therefore exists under 28 U.S.C. § 1332.

**II.  Parties and Venue**

1.      Plaintiffs are L.P. Champ ("Champ"), and L.J. Ammerman ("Ammerman"), wife and husband, United States citizens residing in the State of Arizona.

2.      Defendant Michael Jung ("Jung") is a resident of Germany, residing in Munich, and at all pertinent times herein was a Director and employee of McKinsey & Company. He was therefore McKinsey's actual (or ostensible) agent, acting within the scope and course of his actual or ostensible employment for and with McKinsey in connection with the activities alleged herein. Jung caused events to occur and engaged in acts out of which this matter arises, within the jurisdiction of this Court on behalf of himself and the marital community of Michael Jung and his spouse, Jane Doe Jung.

3.      Defendants Rudolf Meroni and his wife, Jane Doe Meroni, are, on information and belief, citizens of Switzerland. Rudolf Meroni caused events to occur and engaged in acts out of which this matter arises, within the jurisdiction of this Court on behalf of himself and the marital community of Rudolf Meroni and his spouse, Jane Doe Meroni.

4.      Defendant McKinsey & Company ("McKinsey") is a New York corporation doing business within the State of New York, with its principal place of business and home office in New York City.

## III.     General Factual Allegations and Background

### A.     Actions Prior to Involvement of Jung, McKinsey and Meroni.

5.      In the fall of 2008, Champ and Ammerman owned twenty percent (20%) of IEC International Energy Corporation, a BVI corporation ("IEC"). The remaining eighty percent (80%) was owned by Hegor International Ltd. ("Hegor"), a BVI corporation. Hegor was owned by Wolfgang Frank Hertel ("Hertel"), a German citizen, and Alojza Gornicki, his alleged common law wife. IEC was formed for the alleged purpose of developing a new oil recovery technology. The new technology was purportedly developed by Hertel, and IEC was purportedly in the process of having patents issued protecting that technology. Hertel represented to Champ, Ammerman (and ultimately Jung/McKinsey and the German Partner) that the technology he had allegedly invented and developed would enable recovery of residual oil from fields previously explored where not all of the oil had been extracted. Consideration provided by Hertel to IEC for his stock in IEC was his contribution of the allegedly successful technology protected by the alleged patents to be owned by IEC. As consideration for their 20% stock interest in IEC, Champ and Ammerman: 1) advanced approximately $3 Million including funding for the development and securing of the purported patents; 2) provided additional valuable services,  including helping to locate an oil field and secure development

2

rights to test Hertel's alleged technology; 3) attempted to secure additional financing for acquisition of the petroleum rights and exploration of said oil field; and, 4) attempted to secure additional financing for the implementation of the technology to develop said oil field.

6.     It was originally agreed among Hertel, Champ and Ammerman that IEC would form various subsidiaries to handle the international businesses of the development, marketing, and utilization of the alleged technology.  The parties therefore entered into a Shareholders' Agreement (the "Shareholders' Agreement"), setting forth the terms and conditions governing the control and management of IEC, and any subsidiaries to be formed by IEC, to carry out the development and marketing.  Each subsidiary was to be owned 80% by Hegor and 20% by PC-RA owned by Champ and Ammerman.  Organizational documents signed by Champ were sent to Hertel for his execution and forwarding to the Corporation Commission of the BVI for filing.  However, without the knowledge of Champ or Ammerman, Hertel fraudulently changed the organizational documents for the subsidiaries by secretly changing the directors and owners of each company in the documents he filed.  By changing the owners of these subsidiaries, Champ's and Ammerman's purported ownership interest was diluted or deleted entirely.  By changing the Directors of these subsidiaries, Hertel was able to gain putative or apparent (but secret) control of the subsidiaries.

7.     Champ and Ammerman learned that Albania was then endeavoring to become an applicant to enter into the European Union (the "EU") "Accession" process with the goal of becoming a Member State of the EU.  Further, that Albania owned an oil field available for commercial development.  For Membership, a country was required to divest State owned assets, including oil concessions, to private ownership.   Negotiations by Champ and Ammerman (and initially involving Hertel) with the Albanian government Ministry of Energy on behalf of Albpetrol, the Albanian government entity that held all of the government's oil rights, commenced in the fall of 2007 for a Petroleum Agreement to develop the oil.  Champ, Ammerman and Hertel established a company called IEC Visoka, Inc. (BVI) ("Visoka") on January 8, 2008, to be the legal entity for acquisition of the petroleum rights to a producing oil field in Albania known as the "Visoka oil field," the operating entity for the oil recovery program utilizing Hertel's alleged technology.

8.     In May, 2008, Champ, Ammerman and Hertel entered into a Corporate Resolution (the "IEC Resolution"), giving Ammerman and Champ exclusive authority to

negotiate contracts with Albpetrol on behalf of IEC, Visoka and the other IEC subsidiaries to be formed because (Hertel refused to participate in negotiations in Albania).

**B.  Acquisition by Jung and McKinsey of 10% Interest in IEC and Visoka.**

9.      Hertel, Champ and Ammerman were seeking funds to help acquire and finance the acquisition and development of the Visoka oil field in Albania and the IEC business. In the fall of 2008, while looking for potential sources of financing, Champ and Ammerman were introduced to Jung through Hertel in Germany. Jung represented that he was employed by McKinsey as a Director and provided Champ and Ammerman with his business card on which it stated: "Michael Jung, Director, McKinsey & Company, Sophienstraße 26, 80333, Munich, Germany." After doing his due diligence regarding the Visoka oil field project Jung advised Hertel, Champ and Ammerman that he and McKinsey were very interested in becoming part owners in this company and project, including the Visoka oil field and the technology. Jung assured Champ and Ammerman of McKinsey's capabilities to secure financing for the project and to provide other services to help make the project successful. Champ and Ammerman had been negotiating with other companies for financial investment. However, Jung assured them that Visoka would not need the services of other companies because McKinsey could secure all funding from its resources for Visoka and in particular for the acquisition and development of the Visoka oil field. Jung represented further to Champ, Ammerman and Hertel that McKinsey would provide its services and access to its vast network of financial clients and sources to them without a retainer or cash payment in exchange for a 10% ownership interest in the Visoka oil field and technology, with their 10% interest to be owned by Jung and McKinsey in such proportion as was determined between Jung and McKinsey. (Exhibit 1) Champ, Ammerman and Hertel agreed with Jung that the financing raised by Jung/McKinsey would be used for payments to Albania and for operation of the Visoka oil field once the petroleum and license agreements were finalized with the Albanian government, with the further understanding that the ownership of the rights to the Visoka oil field would be held by Visoka. Champ and Ammerman and Hertel agreed to Jung's and McKinsey's terms, leaving the ownership 10% Jung/McKinsey, 20% Champ and Ammerman and 70%, Hertel. Jung's/McKinsey's role for being responsible for and in locating financing for Visoka and structuring the ownership and control of Visoka is evidenced by the emails and documents. The documents were prepared by McKinsey employees on McKinsey formats.

10.     Prior to McKinsey's involvement, Champ and Ammerman had engaged in efforts to obtain financing from other interested sources (which sources also wanted an ownership interest in the project for their participation). Based upon Jung and McKinsey's representations and the agreements entered into between and among the parties, Champ and Ammerman discontinued their efforts to raise capital because Jung had assured them McKinsey would be fully able to find sources for all needed financing. Therefore Champ and Ammerman relied exclusively upon Jung's and McKinsey's promise to secure financing for Visoka. Champ and Ammerman were aware of McKinsey's reputation as being THE leading, management consulting and financial services company in the world (referred to simply as the "FIRM," by itself and in professional circles). As a result of Jung's representations and their knowledge of McKinsey's international reputation, Champ and Ammerman placed complete trust in their new partners, McKinsey and Jung. Because the parties were in the initial stages of organization and financing of the company, the partners agreed to remain in a partnership relation until corporate stock could be issued pending the determination and documentation of the legal structure of the company, which Jung agreed to take the lead in establishing.

11.     Jung and McKinsey began their work as 10% partners/owners in Visoka by gathering technical and financial data to prepare an IEC Visoka Inc., Investment Offering (the "Investment Offering") for use in securing lenders/investors for the Visoka investment. Jung and McKinsey prepared the document for submission to investors by utilizing the resources of Jung and McKinsey's advisors/employees. The Investment Offering was prepared in the McKinsey Munich office by McKinsey staff personnel under Jung's direction. The Investment Offering was then submitted by Jung and McKinsey to potential investors based upon expressed or implied representations to such potential investors that Jung and McKinsey were principals in Visoka.

12.     In the Fall of 2008, in implementation of Jung's and McKinsey's agreement to be 10% partners and to help establish and document the legal structure of the company, Jung asked Champ and Ammerman if they had any contacts with a Swiss law firm since the IEC Shareholders' Agreement was governed by Swiss law and the proposed Petroleum Agreement was to be governed by Swiss law. Prior to 2008, Champ and Ammerman had known Defendant attorney Rudolf Meroni ("Meroni"), an international business attorney headquartered in Switzerland. They therefore recommended him to Jung, McKinsey and Hertel to be considered

5

as legal counsel for IEC, Visoka and the Visoka oil field project.  Although they had known Meroni socially for years, Champ and Ammerman had never been partners with Meroni in any businesses nor had Meroni provided legal services to Champ and Ammerman.

13.   Jung met privately with Meroni regarding the Visoka project in November of 2008.  After conferring with Meroni and doing due diligence regarding Meroni, Jung advised Meroni that he and McKinsey wanted Meroni to be the legal counsel for IEC, Visoka and the Visoka oil field project.  Champ and Ammerman assumed Meroni would be paid for his legal services as the Visoka attorney out of investment funds to be raised by Jung/McKinsey and not as a part owner.

14.   Subsequent to that meeting, Jung told Champ, Ammerman and Hertel that he and McKinsey recommended that Meroni be retained by IEC and Visoka for the legal work that would be necessary for the preparation of the organizational legal documents for the closely held company, for the public financing offering and to act as corporate counsel.

**C.    Champ and Ammerman Negotiate Petroleum Agreement With Albanian Governmental Agency.**

15.   Champ and Ammerman, in the IEC Resolution, had agreed with Hertel they would take full responsibility to negotiate the Petroleum Agreement with Albpetrol, the Albanian agency in charge of an oil field located in Fier, Albania.  The Visoka oil field had undeveloped oil reserves which Albpetrol, the Albanian governmental agency in charge of the field, wanted to commercially exploit with an international company that had the expertise and resources to undertake this long-term venture.  Champ and Ammerman took up residence in Albania in the summer of 2009.  They had studies performed regarding the Visoka oil field potential production and had extensive negotiations with the head of Albpetrol on behalf of Visoka.  Based upon their hard work and negotiating skills, and given McKinsey's participation as a principal, they convinced the Albpetrol decision-makers that Visoka was the company that could successfully accomplish Albpetrol's goals.  Ultimately, they succeeded in negotiating and had executed an unprecedented 35-year (25-year initial term with two lessee's 5-year options) Petroleum Agreement between Albpetrol and Visoka pursuant to the authority vested in Champ and Ammerman by the IEC Resolution.  In order to bind the deal, in compliance with the Petroleum Agreement, Champ and Ammerman personally paid to Albpetrol to secure the Agreement $50,000 as the fee for the issuance of a license to the partnership on the field.

16.     Hertel played no significant role in the negotiation of the Petroleum Agreement initially and none after May of 2008.  Jung/McKinsey determined that the imputed value of the Petroleum Agreement and the Visoka oil field had a minimum value of approximately $150,000,000.00 as of the fall of 2008.  While Visoka, pursuant to the terms of the Petroleum Agreement, indicated that it would attempt to use Hertel's new technology to develop the Fier oil field, use of that technology was not a requirement.  Visoka was free to use any technology it decided to use for the production of oil from the field.  However, the Petroleum Agreement required a $600,000 bank guarantee to proceed with production.  Jung assured Champ and Ammerman that raising that sum, plus the millions of dollars for development of the Visoka oil field, would be something he and McKinsey could easily accomplish.

**D.      Jung Introduces the German Partner to the Project as Potential Investor/Part Owner.**

17.     Jung introduced Plaintiffs to a customer of McKinsey in Germany who was a citizen of Germany (the "German Partner") who resided in Nuremberg, Germany and who was Chairman of a German quasi-governmental agency (the "Agency") which contracted with Jung and McKinsey for government projects.  As CEO of the Agency, the German Partner had the authority to hire consultants to work with the Agency.  For many years prior to 2008, the Agency had employed McKinsey and paid McKinsey approximately 80 million Euros during those years for its services.  (It is believed the Agency still employs McKinsey as a consultant and the German Partner is still associated with the Agency).  During this time period, the principal McKinsey contact with the German Partner and the Agency on behalf of McKinsey was its Director, Jung.  The German Partner and Jung became close associates as a result of the German Partner's relationship with McKinsey.  The German Partner trusted Jung and McKinsey because of his (and its) long-time relationship with the Agency and as a result of their years of close association.

18.     In mid-December, 2008, Jung began to seek to interest the German Partner in becoming a lender/investor in the Visoka oil field development company.  Although he found the project to have merit, after meeting Hertel, the German Partner did not want to be involved with Visoka as long as Hertel was involved in any way.  Because Jung wanted the German Partner to assist him in finding other investors he asked the German Partner to set up a meeting with the two of them and several potential investors.  As a favor to Jung, the German Partner

did so. The meeting was held in the Agency's office in Nuremberg in mid-December, 2008, after the Petroleum Agreement had been signed. These potential investors were very influential in the financial community in Germany and Europe and the German Partner knew them personally. When he was introduced by the German Partner and during this meeting, Jung repeatedly represented to the investors that he was a Director of McKinsey and that he and McKinsey were principals in Visoka. In an effort to raise capital at the meeting, the Investment Offering, prepared by McKinsey, was presented by Jung to the potential investors (including the German Partner).

### E.   Hertel's Fraudulent Representations and Actions.

19.   In the formation of IEC and its subsidiaries, Hertel had represented to Champ and Ammerman that he had a PhD from Columbia University in Petroleum Engineering, and that he had developed a revolutionary process for retrieving oil from low producing or apparently depleted oil fields, to allow recovery of oil left behind because of the primitive technologies used in the original pumping of the fields. He further represented to Champ and Ammerman that his "revolutionary" technology was in the process of being patented through a German patent law firm and provided written documentation of this engagement. Champ and Ammerman paid $300,000 to IEC as part of their capital contribution to IEC for Hertel to pay the Patent Firm to finish processing the allegedly imminent final issuance of the patents. Hertel provided written "evidence" to Champ and Ammerman from the Patent Firm that the patents had been filed and were in process of being approved. Hertel's representations to Champ and Ammerman were material and critical to their continuing to invest with Hertel for the development of the technology and formation and creation of IEC and eventually its subsidiaries, including Visoka. Prior to their involvement with Jung and McKinsey, Champ and Ammerman, in their efforts to raise funding for the project, also repeated Hertel's representations to potential lenders or investors.

20.   In January, 2009, Champ and Ammerman obtained information concerning Hertel which indicated that some of the statements in Hertel's resume and, in particular, Hertel's claim that he had a Ph.D. in Petroleum Engineering from Columbia University, were patently false. Champ and Ammerman then became aware that there were outstanding bench warrants from Canada calling for the arrest of Hertel for income tax evasion. Jung was advised of these charges and Hertel's material false representations. In the Investment Offering prepared by

McKinsey in the Fall of 2008, Hertel's education/pedigree had been prominently featured in support of claims that his technology was reliable even if revolutionary. To Champ's and Ammerman's knowledge, after being told these representations were false, Jung did not make any changes to the Investment Offering materials used by Jung and McKinsey to solicit investors/lenders as a result of this new information. Instead, Jung continued to present it to potential lenders and investors, thereby impliedly representing that Hertel's credentials were valid and true, but failing to disclose his being subject to arrest based on the Canadian arrest warrants. These continuing material misrepresentations contained in the Investment Offering were known by Jung to be false and misleading, but were used nonetheless by Jung/McKinsey to attempt to raise funds for Visoka as part of Jung's secret plan to convert all or a substantial part of the equity in the Visoka oil field to the benefit of McKinsey and Jung.

21.     In May, 2009, Hertel was arrested and jailed in London on the outstanding Canadian warrants. Immediately after Hertel's arrest Champ and Ammerman discovered the Patent Firm had never even filed the patent application even though previously the Patent Firm had sent a letter to Hertel at Hertel's request indicating that five technology patents had been applied for and that those patents would be issued. Jung was made aware of this information and went with Champ and Ammerman to meet with the Patent Firm to confirm the facts. Despite Jung's, and therefore McKinsey's, knowledge of all of these facts concerning Hertel's fraud, (or, as events developed, perhaps as a result of gaining that information), Jung reinstituted his efforts to convince the German Partner, one of McKinsey's best German clients, to invest in the project.

**F.      Jung Consults With Virginia Louise Molino, head of McKinsey Legal Department in New York Who Provides Instruction Regarding How to Deal With Hertel's Arrest, Adverse Publicity, and the Effect of Hertel's Arrest and Incarceration on McKinsey's Investment in IEC and Visoka.**

22.     After it was discovered that Hertel had been arrested and was being held in jail in London, Jung communicated with Hertel through his attorneys. Initially Jung proposed the buyout of Hertel's interest based on Jung providing assistance to him in dealing with legal representation regarding the criminal charges pending against him, plus other inducements proposed by Jung through Hertel's attorneys. After the German Partner found out that Hertel was in jail and based upon Jung's representation that Hertel would be convicted and jailed for a long period of time, and therefore would no longer be a controlling influence in the company,

he withdrew his objection to investing in the company either on a debt or loan convertible to equity basis.  However, because of the German Partner's relationship with Jung and the fact that he did not know Champ or Ammerman, and his desire that Jung be in a position to protect his investment/loan, the German Partner insisted that, after the ouster of Hertel, Jung be appointed as the "Executive Director" of IEC entities and, in particular, Visoka.  Because of Jung and McKinsey's power and international prestige, Champ and Ammerman were agreeable to the plan to have Jung appointed as Executive Director.  However, because of Jung and McKinsey's legal counsel Molino's concern about adverse international publicity regarding Hertel's arrest, it became clear that decisive action had to be taken regarding Hertel's continued association with the IEC entities and the Visoka project.  Further, given the adverse publicity that had occurred regarding Hertel's arrest and his unsavory activities that could affect McKinsey's reputation, Jung sought instructions from Molino how to proceed to protect McKinsey's, and his, interest in  Visoka.

23.    On June 5, 2009 Jung sent an e-mail, written from his McKinsey e-mail address, regarding "Legal Verdict," to Champ and Meroni stating:

"Late last night, I received a call from our legal counsel (NY) [Virginia Louise Molino]. She has done a short due diligence, upon request of the German office.  Her advice is clear:  IEC is dubious.  It took her department not an hour to find out too many things. There must be NO connection to McK, or to McK leaders . . . the envisaged role [of Jung in the Visoka entities] **is** an executive directorship, therefore incompatible with an active role at McK.  (Exceptions only, if in defense of an ownership position.) . . . particular risk is seen in connection with FH [Frank Hertel] who cannot be expected to act benign, or just rational.  'Taking the Firm [McKinsey] hostage' is the biggest fear. (Can't avoid publicity.)  So we need to be creative.  I am busy for the next hours, we should talk early in the afternoon."

24.    This instruction from the McKinsey New York home office legal counsel had been requested by Jung ("upon request of the German office") and the direction from McKinsey's head lawyer in New York, Molino, was the "Legal Verdict" of McKinsey regarding how the then partners (Jung, McKinsey, Champ and Ammerman) should deal with Hertel.  The reference to "IEC is dubious" referred to the fact that Hertel's claims regarding the economic viability of the IEC were not as had been represented.  Jung did not specify what Molino's reference to the "too many things" found out about Hertel by the McKinsey legal department meant.  However, the information learned prompted Molino to state in regard to Jung/McKinsey's investment in Visoka: "There must be NO connection to McK, or to McK

leaders." The reference to the "envisaged role in an executive directorship . . ." refers to the German Partner's desire, in consideration of his making the 3 million Euros loan/investment, that Jung have an active role in Visoka and, in fact, that Jung be the "Executive Director" of that entity. However, as Jung noted, it was McKinsey's home office's legal position this would be "incompatible with an active role at McK, by Jung." That is, presumably Jung could not continue as a Director at McKinsey if he were publicly identified as the Executive Director of Visoka. The "Exceptions only, if in defense of an ownership position . . ." demonstrates both that McKinsey is a principal and reflected the McKinsey head lawyer's position that Jung and McKinsey's role, as part owners of Visoka, could only become known publicly if it were necessary to have Jung become a part of the Visoka management in order to protect the Jung/McKinsey 10% "ownership position**.**" Clearly McKinsey and Jung wanted to protect their admitted "ownership position" in this very valuable investment, while at the same time making sure that none of Hertel's criminal reputation or anticipated non-"rational" response could have any public connection to McKinsey. Thus Hertel could not be allowed to be put in the position where he could take "the firm hostage" because this would cause adverse publicity to McKinsey, its "biggest fear." Molino's statement that Jung could only become a part of company management "in defense of an ownership position" makes it manifest that McKinsey considered the Firm to be a part owner in the company even if only a "silent" partner at that point, but that McKinsey could not take the risk of Jung's and McKinsey's public association with IEC and Visoka (and therefore with Hertel), except to defend Jung's and McKinsey's "ownership position," and in so acting to "be creative" in dealing with Hertel.

25.     Despite the fact the head of the McKinsey New York Home Office Legal Department**,** Molino**,** told the Director that "her advice is clear: there must be NO connection to McK or to McK leaders," (or perhaps because of that advice, presumably because of Hertel's unsavory character and because of the pending criminal charges), Jung, acting in concert with the international business lawyer, Meroni**,** and based upon the instructions given to him by Molino/McKinsey "creatively" contrived a plan to get Hertel to sell his majority interest to Jung, McKinsey and Meroni in exchange in part for McKinsey hiring a lawyer for him, and paying to defend him against the criminal charges. If Hertel refused the offer, Jung would then secretly use Meroni's expertise (and the German Partner's money) in concocting schemes and artifices to squeeze out Hertel and thereby put Jung, Meroni and McKinsey in a position to gain

control of Visoka (which by then McKinsey knew had a much higher value then the prior $150 million imputed value). They would then dilute Champ and Ammerman into a powerless minority position. To effectuate this plan, Jung first secured the agreement of the German Partner to loan 3 million Euros to a UK corporation previously formed by Meroni ("Nexim") for the development of the Visoka oil field under the Petroleum Agreement, which loan could be converted to a 10% interest in Nexim any time during the following 18 months. After June 5, 2009, Jung went to visit Hertel in prison in London, he reiterated his prior written offer to help Hertel with his criminal charges in exchange for Hertel transferring his interest in Visoka to Jung, Meroni and McKinsey. Hertel refused to agree to Jung's offer(s).

26.     Before Jung met with Hertel in jail, Champ and Ammerman objected to Jung's planned course of conduct. They had irrefutable proof that Hertel's resume was filled with lies. Further, that he had defrauded them of their almost $3 million cash investment and stock ownership in Visoka (plus the substantial value of their extensive services including negotiating for and then securing the Petroleum Agreement with their own funds). Also, they had documented evidence of fraud regarding the existence of the alleged patents for the oil recovery process, the validity of the technology and Hertel's alleged credentials. In fact, and in law, Hertel had provided no consideration for his on-paper 80% ownership position in either IEC, or Visoka. In addition, Hertel had made material misrepresentations regarding the value of IEC based upon the false patents and worthless technology in order to induce Champ and Ammerman to invest in IEC stock (and then had defrauded them by secretly changing the organizational documents for Visoka filed with the BVI). Jung and McKinsey (and Meroni) knew all of this about Hertel. Champ and Ammerman therefore insisted that Jung and Meroni use funds from the German Partner's planned loan/investment to file a lawsuit in the BVI court against Hertel and use the irrefutable, truthful (and fully documentable) information they had to have Hertel's stock in IEC and Visoka declared to be void based upon fraud and lack of consideration. Champ and Ammerman opposed Jung's engaging in any "creative" conduct with Hertel to comply with the Home Office Legal counsel Molino's directive that "there must be NO connection to McK or to McK leaders . . .," and that in dealing with Hertel, the actions taken should not be able to be linked back to "The Firm." Jung and Meroni refused to follow Champ and Ammerman's proposed plan of direct action against Hertel, but instead thwarted it, in furtherance of McKinsey's (through Jung and Molino) conspiratorial agreement to take

control of Visoka from Champ and Ammerman (who had put up all of the money and almost all of the work into securing the sole asset of the company, the Petroleum Agreement).

> **G.    Jung Implements the Jung/Molino/McKinsey/Meroni Plan to Use Hertel's Legal Crisis to Oust Hertel and Dilute/Destroy Plaintiffs' Interest in Visoka and Convert Business Opportunity to Benefit of Jung/McKinsey.**

27.    Although the very valuable Petroleum and License Agreements had been signed as of December of 2008 by the proper Albanian agencies and Jung had been engaged in trying to arrange capital since the fall of 2008, by early June of 2009, Jung had not yet secured any committed funds from the German Partner or anyone else. Visoka (Champ and Ammerman) had agreed contractually to provide a bank guarantee in the amount of $600,000, payable to the Albanian Ministry of Energy for the Petroleum Agreement to be fully implemented. However, that sum had not been paid and the very valuable contract rights (then valued conservatively by Jung/McKinsey at well over $150,000,000.00 even without using the Hertel so-called "technology" to develop the field), were at risk of being lost. Visoka also needed funds to arrange for and finance its operations to satisfy the Petroleum Agreement. Moreover, it was determined by Champ and Ammerman in connection with their extensive analysis of the Visoka oil field that with or without Hertel's alleged patented technologies, and simply by using conventional oil recovery processes, the Visoka oil field was much more valuable than the initial $150,000,000.00 imputed value made by Jung/McKinsey in the Fall of 2008. Thus, because of the negotiating skills of Champ and Ammerman, the petroleum rights they had obtained for Visoka turned out to be extremely valuable by using readily available conventional means of extraction than had been used in the earlier extraction efforts by the then-communist government of Albania. The question then became for Jung/McKinsey and Meroni how to deal with Hertel and his claim of a putative interest and still move forward with the development of the Visoka oil field without filing fraud claims against the jailed Hertel in the BVI courts, since to do so would have caused the prohibited-by-Molino "connection to McKinsey, or to McKinsey leaders," or adverse publicity linked to McKinsey. The answer was that Jung, who was in charge of the German McKinsey operations, would oust Hertel/Hegor through applying a fraudulent reinterpretation of the May 2008 ICE Resolution authorizing Champ and Ammerman to negotiate with Albpetrol and to execute the Petroleum Agreement. Additionally, Jung, Molino and Meroni realized that if Champ and Ammerman went to the BVI courts and

were able to remove Hertel from ownership and control of IEC and Visoka, Jung, McKinsey and Meroni would not be able to implement their plan to take Visoka away from Champ and Ammerman, since Champ and Ammerman (subject to the Jung/McKinsey 10% ownership interest) would be in complete control of IEC and Visoka as the only parties owning stock in IEC and IEC Visoka if Hertel's stock was rescinded by the Court for fraud.  Therefore, in order for the plan to work, Jung and Meroni could not file an action against Hertel in the BVI courts or support Champ and Ammerman in such filing even though that would have assured that issuance of the stock to Hertel and his common law wife in IEC and Visoka would have been rescinded by the Court based upon patent fraud.

28.    At some time after Hertel's refusal to sell his interest in Visoka to Jung and McKinsey, Jung and McKinsey and Meroni secretly entered into an agreement -- the Jung/McKinsey/Meroni Plan (hereafter referred to simply as the "J, M & M Plan") -- through a scheme or artifice to defraud Plaintiffs by:  taking control of IEC and Visoka away from Hertel; defraud Champ and Ammerman of their ownership interest in Visoka; selling Visoka to an entity formed by Meroni; and, give Jung/McKinsey and Meroni the power to prevent the German Partner from exercising his planned option to convert a $3 million Euro loan/investment option into a 10% ownership interest in Visoka (per the terms of the loan described below).   Jung/Meroni, in pursuance of the J, M & M Plan, rejected the Champ/Ammerman proposal to oust Hertel directly through a legal action against him in the BVI.  Instead, Jung/McKinsey and Meroni, pursuant to their conspiracy to defraud Champ, Ammerman (and ultimately the German Partner) of their still to be issued shares in Visoka, came up with a plan in May of 2009 that they insisted Champ and Ammerman had to agree to if they wanted Jung and McKinsey to provide access to the needed financing from the German Partner that was then being held in abeyance by Jung.  This plan, according to Jung's representations to Champ and Ammerman, had been approved by Molino and Molino insisted that Jung not go public with these actions in the BVI Court because the plan to transfer stock from Hertel to Nexim was legal.  In truth, Molino did not want public scrutiny of the actions of Jung and McKinsey in dealing with Hertel because this could cause adverse publicity to McKinsey.  Jung told Champ and Ammerman that the proposed plan to void Hertel's stock was, according to Molino, legal.  Further, Jung and Meroni insisted to Champ and Ammerman that the plan to transfer IEC and Visoka's interest in the oil field agreement to Nexim was legal.

14

29.     The first step, pursuant to the J, M & M Plan, was to remove Hertel from his ownership in and control of Visoka by utilizing various corporate Resolutions prepared by Meroni and, on information and belief, at McKinsey's Legal Department's direction (Molino) in order to change the existing Directors of IEC and Visoka.  Further, to perform a corporate reorganization of Visoka and other IEC subsidiaries so that Visoka was owned directly by IEC. The J, M & M Plan involved having IEC then sell all of the shares of Visoka to Nexim,  which corporation was purportedly to be controlled by Champ and Ammerman, with Jung, McKinsey and Meroni purportedly to be minority shareholders. Jung and Meroni advised that by adopting this plan, this would allow the group headed by Champ, Ammerman, Jung and Meroni to move forward with the development of the Visoka oil field utilizing the German Partner's proposed 3 million euro loan/investment to Nexim, with Hertel being ousted from the control of IEC and the ownership/control of Visoka and with the German Partner having the ability to convert his loan into a 10% ownership interest in Nexim.

30.     Jung, based upon the fact that Hertel had been arrested, and Jung's assessment that Hertel was going to be incarcerated in Canada for a long period of time, and based upon the information provided to him by Champ and Ammerman regarding Hertel's false credentials and lack of consideration for his stock, then used the fact of Hertel's arrest and impending ouster from the company to convince the German Partner to agree to make the 3 million Euros loan (at 7% annual interest) to Nexim, with an option to convert the loan into a 10% stock ownership in Nexim, at the German Partner's election over an 18-month period.  However, Jung failed to tell the German Partner all of the facts he had discovered regarding Hertel, or about the fact that Jung, Molino and Meroni had concocted the J, M & M Plan to oust Hertel initially from IEC and then to oust Champ and Ammerman. The German Partner did not agree to make the loan until he was assured by Jung and Meroni that all of the documents prepared by Jung and Meroni removing Hertel from control of IEC and Visoka were legal and binding and that Hertel's stock in Visoka would no longer exist, and Hertel could not defeat the plan to use the German Partner's money to develop the oil field.  Jung and McKinsey gave these assurances to the German Partner despite Molino's knowledge that, based upon her investigation of Hertel, McKinsey could not expect Hertel "to act benign, or just rational," and that her "biggest fear" was that Hertel would "take the Firm hostage."  Defendants knew that the documents executed as part of the J, M & M Plan could not withstand legal scrutiny to

remove Hertel from control of IEC or ownership/control of Visoka, but proceeded anyway, thereby assuming the risk that Hertel would get out of jail and vindicate his legal rights and have his ouster set aside. However, Defendants hid the risk from the German Partner and Champ and Ammerman.

31.     Meroni, in conspiracy with Jung, and acting based upon the advice Jung received from Molino (with whom Jung claimed he had been consulting and receiving direction), advised Champ and Ammerman that they had legal authority to execute Resolutions prepared by Jung and Meroni based upon the IEC Resolution. Jung and Meroni also represented to Champ and Ammerman that either one of them had the right to execute documents on behalf of Hertel, his common-law wife and Hegor, Hertel's corporation.

32.     Jung and Meroni further represented to Champ and Ammerman that Nexim, formed by Meroni, would be owned 80% by Champ and Ammerman, 10% by Meroni, and 10% by McKinsey and Jung, with 10% of Champ and Ammerman's ownership interest to be made available to the German Partner if the German Partner converted his loan to an ownership interest in Nexim.

33.     Issuance of stock to Meroni for his 10% interest was allegedly in consideration for Meroni performing the necessary legal work for IEC and Visoka, including handling the legal work associated with dissolving Hertel's control of IEC and ownership in and control of Visoka, and the establishment of the ownership and control of Nexim. Jung/McKinsey's 10% partnership interest previously agreed to, was to be converted to a stock interest in Nexim in consideration for Jung and McKinsey's securing the 3 million euros from the German Partner and Jung and McKinsey securing needed additional capital for the Visoka oil field.

34.     Champ and Ammerman initially resisted the J, M & M Plan insisting that the proper approach was for Meroni, on behalf of Champ and Ammerman, to file litigation in the courts of the BVI to divest Hertel of his stock ownership in the IEC entities once and for all because of his fraud and failure of consideration. However, Jung (relying upon the advice of McKinsey's New York legal department [Molino]) and Meroni continued to insist to Champ and Ammerman that the J, M & M Plan was the proper legal method to deal with the Hertel issues, and to reorganize the company, and allow the company to move forward to take control of and finance the Visoka project, even though Jung, Molino and Meroni all knew that was false. Because they had invested virtually all of their capital in the Visoka project, without the

German Partner's 3 Million euro loan controlled by Jung and McKinsey, Champ and Ammerman would have had to seek other capital to bring suit in the BVI courts, which was virtually impossible to raise given that Hertel's ownership interest had not been resolved.  Jung, in order to convince Champ and Ammerman to agree to the J, M & M Plan, told them McKinsey would only convince the German Partner to make the loan/investment if the J, M & M Plan was put into effect.  Jung advised Champ and Ammerman that he had consulted with McKinsey's New York legal counsel, Molino, regarding the Hertel situation and that Molino had directed Jung that he should be wary in his dealings with Hertel because McKinsey did not want any public notoriety resulting from a public airing of the Hertel fraud allegations/criminal charges. Further, the "Firm" was very concerned Hertel's conduct could cause adverse publicity to it so that in handling the Hertel situation there was to be "no connection to McK or McK leaders," and no "bad publicity" that would allow Hertel to "take the Firm hostage."  This risk was particularly patent given that Jung had already exposed McKinsey to possible liability through McKinsey's involvement in preparing the now false Investment Offering, thereby exposing McKinsey to possible securities law violations.  Therefore, Jung/McKinsey were insisting Champ and Ammerman follow the J, M & M Plan to privately oust Hertel without any court filings generating any publicity.

35.     Ammerman and Champ were further directed by Jung and Meroni not to have the Nexim contract documents reviewed by independent counsel on behalf of Champ, Ammerman as Meroni was representing all of them in drafting the documents, and if they shared the contents of the drafted documents with US legal counsel such review could jeopardize the tax status of Visoka, as well as possibly create adverse publicity for McKinsey because Jung was still dealing with Hertel, albeit at this point, with his ouster. Based upon representations made by McKinsey, Jung and Meroni to Champ and Ammerman, they agreed to enter into a contract with Jung/McKinsey (through Jung and Meroni as outlined).  Meroni, being an experienced Swiss law/international attorney, and Jung with years of experience with McKinsey and with access to legal advice from Molino, both knew that the documents (prepared by Meroni, and approved by Jung/McKinsey) were fraudulent and subject to Hertel being able to set them aside.  Champ and Ammerman did not know this and they had no choice, under the circumstances, but to trust and rely upon the legality of the J, M & M Plan and Meroni's, Jung's and Molino's representations and legal advice and, therefore, reluctantly

agreed to the J, M & M Plan.  However, as Champ and Ammerman subsequently discovered, these representations were false and made as a part of McKinsey's (Jung's, Molino's) and Meroni's scheme and artifice to defraud Champ and Ammerman of their rightful ownership interest in Visoka.

36.     Champ and Ammerman, in reliance on the bona fides, advice and admonitions of Jung, Molino (as communicated by Jung) and Meroni, did not have the documents reviewed by independent counsel prior to executing them, thereby unwittingly entering into a contract with Jung, McKinsey (through Jung) and Meroni adopting and documenting the J, M & M Plan. The German Partner was also advised not to have counsel review any of the documents and, therefore, he relied on Jung (and therefore Molino) and McKinsey to be sure everything was legal.

37.     On July 11, 2009, Jung caused the German Partner to sign a Loan Agreement with Nexim, confirming the German Partner's 3 million Euros loan/equity option.  The German Partner was fraudulently induced by Jung/McKinsey, pursuant to the J, M & M Plan, to loan/invest the 3 million Euros to Nexim.  During the negotiations for the Loan, Jung, who had an absolute conflict of interest in doing so, conducted all negotiations on behalf of the German Partner.  The Loan Agreement was only signed after Jung secured Champ and Ammerman's signatures to the contract documents.  The Loan documents stated that the Visoka stock was then owned by Nexim, which was false as known to Jung, Molino and Meroni for the above stated reasons.  The Loan documents also provided that the loan proceeds would be held in an account controlled by Meroni rather than in Nexim.

38.     Champ and Ammerman executed these documents in reliance upon the truthfulness of the representations of Jung and Meroni that these documents provided a safe and legal method to dispose of Hertel's interest and to transfer control of Visoka and the Visoka oil field to Nexim (which they in turn would control).  Since Hertel's technology had been discovered to be worthless and because negotiation of and the entering into of the Petroleum Agreement with Albpetrol was accomplished solely by Champ and Ammerman through utilizing their funds and efforts, and because Hertel contributed nothing to securing the Petroleum Agreement by way of funds or services, Champ and Ammerman, based upon Jung/McKinsey and Meroni's advice, believed they were legally justified in taking those actions.  In addition, on several occasions Jung informed Champ and Ammerman that if they

did not execute these documents and otherwise comply with the J, M & M Plan, he would not be able to secure the loan/investment from the German Partner and the Petroleum Agreement would be lost. On the other hand, if they did execute the requested documents and go along with the J, M & M Plan, Jung would be able to obtain the initial funds from one of McKinsey's best clients, the German Partner, obtain the $600,000 bank guarantee to proceed with implementation of the Petroleum Agreement, and would provide funds for Nexim (Visoka) (i.e., Champ and Ammerman) to implement the Petroleum Agreement.

39.     Before the Loan Agreement was finalized, Jung presented the loan with Nexim to the German Partner on behalf of McKinsey utilizing McKinsey email correspondence to the German Partner in a document entitled "Nexim Oil Corporation Legal Structure."

40.     Jung had not allowed the German Partner to be in contact with Champ and Ammerman or vice versa. As subsequently discovered, Jung represented to the German Partner, based on the J, M & M Plan's procedure to terminate Hertel's interest, that Hertel had no further ownership interest or control over Visoka and was therefore permanently "out of the picture." This complied with a strict condition of the German Partner making the loan/investment. Based upon the representations of Jung and his trust in Jung and McKinsey, the German Partner made the Loan to Nexim on or about July 11, 2009 in the amount of 3 million Euros, at 7% annual interest, convertible for eighteen months to a 10% ownership interest in Nexim, if the German Partner so elected. Jung, on behalf of McKinsey, represented to the German Partner that the J, M & M Plan was very secure and legal, and that it had been set up through the McKinsey home office legal department (through Molino) and that Nexim would have appropriate legal title in and to Visoka, and therefore the Visoka oil field, and that said oil field therefore served as collateral to secure repayment of the Loan. Further, that Hertel would no longer be involved in Visoka.

41.     These representations and other assurances were made from McKinsey's email accounts by Jung acting with the actual or ostensible authority of McKinsey, and within the actual or ostensible course and scope of his employment with McKinsey and the parties' agreement.

42.     After Jung and Meroni had Champ and Ammerman executed all the documents included in the J, M & M Plan, Jung/Meroni filed documents with the BVI government agency purportedly changing the Directors of IEC and Visoka and the ownership of Visoka from Hertel

to IEC Tech (as Director of IEC and Visoka) and IEC (as the owner of Visoka), thereby making it possible for IEC to sell the shares in Visoka to Nexim. Shortly thereafter, Jung and Meroni secretly also added another entity controlled by Jung and Meroni (Euro) as an additional Director of Visoka, which addition was hidden from Champ and Ammerman.

43.     In reliance upon Jung, McKinsey's and Meroni's representations, Champ and Ammerman returned to Albania in July, 2009 with their US team to implement the Petroleum Agreement, and to coordinate with Albanian authorities to prepare to take over the Visoka oil field. They intended to begin production operations and to prepare a reservoir study to determine the true potential value of the field. They did all of this in reliance upon their supposed 70-80% ownership interest in Nexim and McKinsey's/Jung's representation that the German Partner €3 million investment would be used to fund the Visoka oil field operations, including prompt payment of the $600,000.00 guarantee payable to the Albanian Ministry of Energy to insure that amount would be spent to further the development of the Visoka oil field in the first 18 months of operation to satisfy that requirement of the Petroleum Agreement.

44.     Although Champ and Ammerman solely had negotiated for the Petroleum and License Agreements pursuant to Champ and Ammerman's authority under the IEC Resolution, Hertel had been the one who signed the documents negotiated by Champ and Ammerman on behalf of Visoka as its then-CEO. After July of 2009, Meroni wrote a letter to the Albanian government verifying that Champ and Ammerman did, in fact, have the authority to represent Visoka confirming to the Albanian government that IEC Tech was the only Director of Visoka and that Champ and Ammerman were the sole directors of IEC Tech. At the time this letter was written, it was fraudulent since Jung and Meroni had already secretly added an additional entity controlled by Jung/McKinsey and Meroni as an additional Director of Visoka. The J, M & M Plan therefore also sought to defraud the Albanian government. By adding the additional Director, in addition to defrauding the Albanian government, IEC Tech was no longer the sole Director of Visoka and therefore Champ and Ammerman were not in control of Visoka. Jung and Meroni made this change in the Directors of Visoka in the same fashion as they did in changing the Directors of IEC. Using this illegal method of changing Directors enabled them to subsequently, putatively and illegally remove IEC Tech as a Director of Visoka, thereby making Euro the sole Director of Visoka and removing Champ and Ammerman from any position in Visoka and taking complete control of Visoka for Jung/McKinsey and Meroni.

45.    In January, 2010, Meroni, acting in concert with Jung/McKinsey, but unknown to Ammerman and Champ, filed documents with Company House in London stating that Champ and Ammerman had no ownership interest in Nexim, and that Nexim was completely controlled by Jung/McKinsey (10%) and companies controlled by Meroni (90%). This allowed Jung and Meroni to dictate the terms of a subsequent 3/3/10 Agreement (see *infra, ¶49*) since Champ and Ammerman thereafter had no ownership interest of record in Nexim. This was directly contrary to Jung's, McKinsey's and Meroni's representations to Champ, Ammerman and the German Partner and was a fraudulent act intended to put Jung/McKinsey and Meroni in complete control of Nexim and therefore Visoka (and the Visoka oil field). In furtherance of the J, M & M Plan to oust Champ and Ammerman, in December 2009, Jung had sent a former McKinsey employee to secretly gather information against Champ and Ammerman by meeting with them at their home in Arizona (where they were on Christmas leave) under the pretense of performing company business. On December 11, 2009, Jung sent an e-mail to Meroni and copied his delegated agent describing the planned ouster of Champ and Ammerman, but indicated that no action would be taken for approximately three months. Three months later, Jung and Meroni took that action which resulted in the execution of the 3/3/10 Agreement.

46.    In further implementation of the J, M & M Plan, in late 2009 and early 2010, Jung and Meroni began a slow pay/no pay funding program with Champ and Ammerman which interfered with their ability to implement the Petroleum Agreement with their team of workers, both US and Albanian. Champ and Ammerman protested to Jung and Meroni regarding the lack of funding and over who was to have operational control of the Visoka oil field. Because Jung and Meroni controlled the German Partner's investment money, they could refuse, contrary to their prior agreement with Champ and Ammerman, to timely fund the operations in Albania necessary for the opening of the Visoka oil field. Champ and Ammerman, therefore, had great difficulty moving forward with the project. Meanwhile, Jung continued to keep Champ and Ammerman from being able to talk with the German Partner to advise him of how Jung was handling his investment.

47.    Jung, McKinsey and Meroni then conspired with officials in the Albanian government to withdraw any authority of Champ or Ammerman in Visoka and to thereby remove Champ and Ammerman from control of the Visoka oil field, Visoka and its Albanian subsidiary. Meroni and Jung did so by utilizing the authority that Jung, McKinsey and Meroni

had fraudulently obtained to control Nexim.  In fact, Meroni had not transferred to Champ and Ammerman the 80% interest in Nexim that he and Jung had contracted with Champ and Ammerman that they (and McKinsey) would do in consideration of Champ and Ammerman signing the documents to implement the J, M & M Plan, nor were any stock certificates ever issued to them.

48.     A series of meetings were held among Meroni, Jung, the German Partner, Champ and Ammerman in early 2010.  During those meeting Jung and Meroni continuously tried to get Champ and Ammerman to execute agreements that would give Jung and Meroni absolute control of Visoka and dilute Champ and Ammerman's ownership interest in Nexim (and therefore Visoka) to around 45%.  On March 3, 2010 Champ and Ammerman, at the insistence of Jung, signed an agreement (the "3/3/10 Contract") (Exhibit 2) which, unknown to Champ and Ammerman, put the final part of the J, M & M Plan into effect.  At that meeting Jung told Champ and Ammerman that it was necessary for them to sign the agreement reducing the ownership interest they would own and control to 45% of the company. Champ and Ammerman had no choice but to sign since they were placed under economic and legal duress by Jung/McKinsey and Meroni.  Further, they had no chance to thoroughly review the document with counsel, or to secure funds to protect and implement the Petroleum Agreement.  Based upon the actions taken by Jung/McKinsey and Meroni in late June and July of 2010 (as described in paragraph 53), Jung/McKinsey and Meroni breached the 3/3/10 Agreement in July of 2010 when they ousted Champ and Ammerman from Visoka entirely.

**H.     Jung, McKinsey and Meroni Take Over Visoka Oil Field Operations in Albania.**

49.     Champ and Ammerman had been working in Albania with their team to implement the Petroleum Agreement since August 1, 2009.  On July 3, 2010, unknown to Champ and Ammerman, based upon directions from Jung and McKinsey, Meroni wrote a letter to the US Embassy in Albania, which stated that the authority of Champ and Ammerman (which had previously been vested in them by Visoka) was being transferred to new Directors for Visoka as part of a corporate "reorganization." This letter ordered the ouster of Champ and Ammerman as the Directors of Visoka (by removing IEC Tech as a Director) and removing them as the Administrators of Visoka's Albanian subsidiary, which conducted most of the operations in Albania.  Champ and Ammerman were then accosted at gun point by Albanian

mafia (identified to them as such by the Fier police) who were hired (according to the mafia members present) by Jung and Meroni.  The letter and the thugs demanded that Champ and Ammerman immediately vacate the office and surrender all company documents and records. Champ and Ammerman's lives were threatened and one of their loyal female employees was assaulted by the thugs.  Champ and Ammerman, at great physical risk, refused to give the thugs access to the offices and the police were called to keep the thugs at bay.  Champ and Ammerman were able to escape the offices (with Champ suffering serious physical injuries in making the escape), but they were able to get most of the important company documents out of the offices. Two days later they were able to escape from Albania.  In fact, unknown to Champ and Ammerman, Jung (and, therefore, McKinsey) and Meroni had entered into a plan with certain Albanian officials to pay them bribes in violation of the Foreign Corrupt Practices Act for the ouster of Champ and Ammerman and the turning over of the Visoka oil field to representatives of Jung/McKinsey and Meroni.  In furtherance of this takeover, Jung and Meroni filed fraudulent documents with Albanian authorities removing Champ and Ammerman from any control of Visoka or its Albanian subsidiary.  They also used fraudulent documents to freeze the company bank accounts and stole $40,000 of personal funds owned by Plaintiffs and transferred into the company bank account.  These actions taken by Jung and Meroni breached the terms of the June 2009 and 3/3/10 Agreements and the partnership that existed between the parties previously.

I.      **Hertel Gets Out of Jail And Goes to the BVI Courts and Has His Alleged Ouster Set aside.**

50.     Hertel was released from jail in September of 2010, and in December 2010, filed a Petition with the BVI courts seeking a judicial declaration as to the legality of the J, M & M Plan that purportedly caused him to be ousted of his control of Visoka.  Jung, Molino and Meroni could not/would not argue to the BVI court that Hertel's prior conduct had constituted fraud based upon all of the false representations he had made to Champ and Ammerman (and through Jung to the German Partner), because to do so would expose McKinsey and its "leaders" to the fact "The Firm" was doing business with an accused tax fraud and international con man, and to their fraudulent plan to oust Champ and Ammerman. Hertel readily obtained a Summary Judgment in January 2011, by alleging (and proving) that the documents included in the J, M & M Plan were legally incompetent to justify his ouster as a Director of IEC and

Visoka, thereby setting aside his purported ouster and returning his directorship and control of Visoka to Hertel.  As a result of the BVI court judgment and its implications concerning the Directorship of IEC, the German Partner's right to convert his Loan into 10% ownership of Nexim became worthless since Nexim did not own the Visoka shares and those shares were the only asset of Nexim.  Thus, Hertel regained full control of Visoka and the Petroleum Agreement.  The result of the entry of this Judgment was hidden from Champ, Ammerman and the German Partner as was the fact that the German Partner's Loan to Nexim had as a result became worthless.

51.     Since Jung and Meroni did not tell Champ or Ammerman of the suit filed by Hertel in the BVI, Champ and Ammerman did not find out about the suit until after Summary Judgment had been granted in favor of Hertel, thereby preventing Champ, Ammerman from going to the BVI courts to show the fraudulent acts of Hertel.  Moreover, Jung and Meroni's Response filed with the BVI court to Hertel's suit made Champ and Ammerman appear to be part of a fraudulent scheme since Champ and Ammerman were the only ones who, at McKinsey/Jung and Meroni's direction, signed the documents implementing the J, M & M Plan.  This also prevented Champ and Ammerman from being able to establish Hertel's fraud or his failure to have provided consideration for his shares.  Also, Jung and Meroni were well aware, as a result of their cutting off funding to Champ and Ammerman to operate Visoka, that Champ and Ammerman did not have any financial resources to hire lawyers to petition the BVI court to set aside Hertel's fraud in securing his share in IEC and Visoka and to take putative control and ownership of IEC and Visoka away from Hertel.   And, in any event, Champ, Ammerman and the German Partner did not discover the fraud behind the J, M & M Plan until years after Hertel's Judgment was final.

52.     Jung's (and McKinsey's) motive to breach the contract with Champ and Ammerman and ultimately the German Partner, and to engage in fraud on them by conceiving and implementing the J, M & M Plan, was prompted by a highly sophisticated technological reservoir study done in 2009-10 on the reserves of the Visoka oil field proved that even without utilization of Hertel's non-existent technology, and assuming an average price of $70 per barrel over 25 years, the value of the reserves was well in excess of $2 billion, valuing only a portion of the concession based only on use of then-available technologies for extraction.

53.     Once Jung, McKinsey and Meroni became aware of this value, they began in

earnest their campaign to gain complete control and ownership of the Visoka oil field for McKinsey, Jung and Meroni.

54.     The J, M & M Plan also included bribing, if necessary, one or more officials of Albania's Ministry of Energy to secure their cooperation in Champ and Ammerman's ouster from Albania.  To facilitate the J, M & M Plan, Jung hired a former McKinsey associate as a consultant for Visoka.  He was purportedly to assist in dealing with the Minister of Energy, Dritan Prifti and his Chief of Staff, Ilir Ciko.  Prifti had faced numerous legal challenges associated with accepting/demanding bribes to do business in Albania as documented by the FBI and others.  Jung (and therefore McKinsey) engaged in conduct that, under United States law, would be a violation of the Foreign Corrupt Practices Act in order to assure that once Jung/McKinsey and Meroni had ousted Champ and Ammerman, on July 3, 2010, McKinsey through Jung and Meroni would then be able to operate the business despite violating the law and thereby convert the $2-3 billion potential equity in Visoka to themselves and McKinsey.  According to documents and conversations supplied to Champ and Ammerman in January 2012 by the former McKinsey associate hired as a consultant, they accomplished this takeover by having a meeting in Germany with the Minister of Energy from Albania at which times bribes were apparently offered in violation of the German Foreign Corrupt Practices Act, the laws of Albania, and the laws of the United States where McKinsey's home office is located.

55.     Jung and Meroni ultimately informed the German Partner of the grant of Summary Judgment in favor of Hertel, but Jung assured him that Meroni was appealing the Summary Judgment order.  However, Jung and Meroni then failed to file the appeal.  They failed to appeal because to do so, they would have to expose the "McKinsey leaders" to adverse publicity and the fact that McKinsey's New York legal counsel, Molino, was involved in providing advice to Jung as to how to oust Hertel and in contriving the plan to use the IEC Resolution as the "legal" vehicle to oust Hertel in order to keep secret McKinsey's involvement in the investment.  As a result, the German Partner, Champ and Ammerman lost the right to contest Hertel's seizure of control of Visoka and the German Partner lost 3 million Euros investment because Hertel now controlled everything.  Because of Jung/McKinsey and Meroni's actions, not only did they lose the interest in the field to Hertel, but Hertel would not deal with Champ or Ammerman.  The Petroleum Agreement was lost and, therefore, the German Partner's loan became unsecured.  Thus, Champ, Ammerman, and the German Partner

all lost their rights in the Visoka oil field Petroleum Agreement which Hertel had converted to his own use by surreptitiously paying Albanian officials bribes (that Champ and Ammerman had refused to pay) (which Jung, for himself and McKinsey and Meroni, was prepared to pay -- and may have paid) all of which became moot because of Hertel's successful legal action in the BVI court.

## COUNT ONE – BREACH OF CONTRACT CLAIMS
### BY CHAMP AND AMMERMAN AGAINST DEFENDANTS

56.     Champ and Ammerman reallege the allegations of paragraphs 1-55 and incorporate them by reference as if fully stated here.

57.     Defendants' conduct breached the 3/3/10 contract (Exhibit 2) between the parties resulting in the loss of the Petroleum Agreement and the Visoka oil field.  It also resulted in Champ's and Ammerman's inability to go to the BVI courts to remove Hertel from ownership and control of IEC and Visoka, and to return to Albania and continue with the Visoka oil field project themselves.

## COUNT TWO –COMMON LAW FRAUD BY DEFENDANTS
### AGAINST CHAMP AND AMMERMAN

58.     Champ and Ammerman incorporate by reference all the allegations contained in paragraphs 1-57 as set forth herein verbatim.

59.     As part of the J, M & M Plan to utilize artifices and devices to defraud and deceive Champ and Ammerman in securing their signatures to the J, M & M Plan, Defendants had represented to Champ and Ammerman that the J, M & M Plan was valid, legal and viable, and represented to Champ and Ammerman that the IEC Resolution fully authorized Ammerman to sign documents on behalf of Hertel and his corporation, Hegor.  Defendants intentionally and fraudulently failed to disclose the risks involved when the documents were presented to Champ and Ammerman to sign.  Defendants hid from Champ and Ammerman that Jung and Meroni were willing to take the risk of Hertel someday getting out of jail and having these documents declared null and void.  Defendants also hid from Champ and Ammerman that they had a plan to divest Champ and Ammerman of their shares in connection with a business plan Defendants had conceived and had put into legal force to make it appear that Champ and Ammerman would receive a 70%-80% ownership stock in Nexim when, in fact, said ownership would not vest in them, but rather in a "London Companies House" entity designed and created by Meroni

(essentially in his name in trust, for the sole benefit of Jung, McKinsey and Meroni).  At the time that Defendants were making the representations to Champ and Ammerman, Defendants lied to them by stating that Champ and Ammerman would not be able to oust Hertel from IEC and Visoka by having the BVI court declare Hertel's conduct in receiving his shares to be fraudulent and based upon a lack of consideration, as Champ and Ammerman had requested Defendants to do by filing papers with the BVI court documenting such actions by Hertel. Defendants knew that Champ and Ammerman had no financial assets to fund such a legal proceeding because they had: 1) discontinued all efforts with other interested lenders/investors based upon Jung/McKinsey's assurances that McKinsey would provide the necessary capital; 2) invested virtually all of their funds in IEC and Visoka and the Petroleum and License Agreements; 3) because Hertel had continually demanded capital from them to fund the patents and oil field search, alleged technology development, etc.; and 4), because they had suffered financial set-backs as a result of the collapse of the Arizona real estate market beginning in 2008-2009 causing Champ and Ammerman to be dependent upon the German Partner's investment for operating funds in connection with the Visoka project and for McKinsey to keep its promise through Jung to raise necessary capital.

60.     For all the reasons set forth above, the J, M & M Plan and the 3/10/10 "contract" were based upon fraudulent misrepresentations and fraudulent artifices and schemes to defraud Champ, Ammerman and the German Partner, done by Defendants to wrest control of the Visoka oil field to their benefit from Champ, Ammerman and the German Partner, the only persons who had invested any actual money in IEC and Visoka.

a.     Further, Defendants, and each of them, made affirmative misrepresentations; that is, the suggestion of a fact which is not true by one who does not believe it to be true.  In addition, Defendants concealed facts or only told half-truths regarding facts by Defendants giving information of other facts which were likely to mislead for want of communication of that fact.  In addition, Defendants made false promises to Champ and Ammerman, individually.

b.     Defendant Jung advised Champ and Ammerman that he had consulted with Defendant Molino the head of the McKinsey home office in New York to seek legal advice regarding how to deal with the fact that Hertel was in jail and the fact that Champ and Ammerman had discovered that he had told lies with regard to his

credentials and, in particular, that he supposedly had a Doctorate in Petroleum Engineering from Columbia University, when he did not, and that he owned patents on his so-called technology which he did not.

c.     After Jung received advice from Molino regarding how to proceed, he advised Plaintiffs Champ and Ammerman that the advice from Molino was clear: there was to be "NO CONNECTION TO McK OR TO McK LEADERS." This advice was given because otherwise Hertel might "take the Firm hostage." Nonetheless, Molino had advised Jung that he/McKinsey could nonetheless be associated with the Visoka investment publicly if necessary "in defense of an ownership position." Therefore, in order to avoid any adverse publicity to McKinsey, it was necessary for Jung to be "creative" in dealing with Hertel in order to protect McKinsey's ownership position while at the same time not having McKinsey's name publicly associated with the Hertel ouster. By Jung stating that, in light of the foregoing: "We need to be creative . . . ." Jung, therefore, led Champ and Ammerman to believe that McKinsey's Home Office legal counsel was acting as legal counsel to Visoka in connection with how to deal with the Hertel situation. Further, that it was her advice that it was appropriate for Jung to proceed with his "creative" plan to oust Hertel, but that he should do so with discretion and not in such a way so as to embarrass McKinsey or its "leaders" so as not to allow Hertel to "take the Firm hostage." Molino's advice to Jung's further involved, as part of this "creative" solution to the Hertel problem (the J, M & M Plan) was a plan to overrule and override Champ and Ammerman's desire to use company funds borrowed from the German Partner to go to the BVI Corporation Commission and have Hertel's ownership in, and control over, IEC and Visoka declared null and void based on his fraud in the inducement of Champ and Ammerman in convincing them to fund the establishment and operation of IEC and to pay for the alleged patents which never, in fact, existed. Jung/Molino refused to follow this plan because it could allow McKinsey's role to become public and subject to adverse publicity. Further, it would give Champ and Ammerman actual control of IEC and Visoka and thereby thwart the J, M & M Plan to take control and ownership of Visoka away from Champ and Ammerman.

d.     Instead of following the demand by Champ and Ammerman to proceed

to deal with Hertel in an above-board, legal manner with no risk, Defendants engaged in a concerted course of action (the J, M & M Plan), the purpose of which was to set up a scheme or device to defraud Champ and Ammerman of their interest in the Petroleum Agreement and Visoka by Defendants first gaining control of the Visoka stock and then ousting Champ and Ammerman from any ownership in Nexim and therefore Visoka.

      e.      Defendants accomplished this by convincing Champ and Ammerman that because McKinsey through Molino, had given Jung the go-ahead to negotiate with Hertel in jail, Champ and Ammerman should agree to the reorganization plan proposed by Jung and Meroni to "write" Hertel out of the company.  That is, to use the IEC Resolution pursuant to which Champ and Ammerman were purportedly given virtually plenary power to deal with affairs of IEC (but not including the ability to vote on behalf of Hegor or Hertel as was done in some of the documents prepared by Jung and Meroni).  Thus, Defendants were able to convince Champ and Ammerman to agree to the decision to adopt the J, M & M Plan to divest Hertel of his control over IEC and Visoka, his ownership in Visoka, and therefore his claimed interest in the Petroleum Agreement, based on the fact Molino had helped with and authorized Jung's proposed "creative" plan to oust Hertel from IEC and Visoka.  Further, implementing Defendants' plan by Meroni preparing a series of documents, the intent of which was to accomplish those goals, but which Defendants knew was extremely risky because if Hertel ever was able to go to court to challenge the corporate structure established by Meroni, he would easily be able to have it set aside because the IEC Resolution upon which the J, M & M Plan rested for its legal efficacy, properly understood, did not allow Ammerman to vote on behalf of Hegor or Hertel.  Additionally, the Shareholders' Agreement for IEC required that five Directors be appointed once the original Director was properly removed.  Instead, the J, M & M Plan only called for the appointment of one new Director for IEC, namely IEC Tech.  But, because of their fraud, Defendants would not be able to defend their actions in court against Hertel because to do so would expose to public scrutiny the J, M & M Plan to defraud Champ, Ammerman and the German Partner and to Hertel's unsavory reputation/background.

      f.      Therefore, Defendants, by not telling Plaintiffs Champ and Ammerman the truth about the risks that they were taking by agreeing to the J, M & M Plan, and by

placing Champ and Ammerman under economic duress in forcing them to agree to the plan, as further implemented by the 3/10/10 "contract," committed a fraud on Plaintiffs Champ and Ammerman by failing to state material facts that were necessary for Champ and Ammerman to be able to form an accurate and uncoerced belief upon which they could make a decision regarding what action to take.

g.      Defendants also failed to tell Champ and Ammerman in connection with the establishment of Nexim that their intent (as part of the J, M & M Plan) was to wrest control and ownership of Nexim away from Champ and Ammerman by never establishing Champ, Ammerman or PC-RA as the owner of 70% of the stock in Nexim. Defendants knew the J, M & M Plan was not to vest any Nexim stock in Champ, Ammerman or PC-RA, but rather to have all of the stock of Nexim owned by companies owned and controlled by Jung/McKinsey and Meroni.  As a result, the ownership interest in Nexim that was to be owned by Champ, Ammerman (70% as represented directly to them by Jung and Meroni), was lost. Defendants hid all these true facts from Plaintiffs Champ and Ammerman in order to get them to agree to the J, M & M Plan, and to sign the 3/10/10 "contract" (Exhibit 2).

h.      Defendants also failed to advise Champ and Ammerman that it was their intent to oust them from their positions as managers of the Visoka office in Fier, Albania; or to file false documents with the Albanian government making misrepresentations regarding the conduct/status of Champ and Ammerman.

i.      Defendants failed to tell Champ and Ammerman of the fact that Defendants had engaged in Foreign Corruption Practices Act violations in Germany and in Albania and, constructively, in the United States by virtue of Defendants' actions with Albanian officials to allow them to take over control of Visoka and its Albanian subsidiary without opposition from the government.  Further, that Defendants intended to falsely inform the United States Federal Bureau of Investigation that Champ had engaged in criminal activities and thereby cause an investigation to occur in the United States of Champ by accusing her of theft of Visoka assets which, in fact, Defendants did, causing Champ to be made the subject of an FBI investigation that Defendants caused to occur by their false allegations, and to coerce and intimidate Champ and Ammerman from learning the true facts of Defendants' fraudulent conduct.

j.      Defendants also failed to advise Champ and Ammerman that after Hertel did get out of jail and did go to the BVI to vindicate his rights and have control of Visoka returned to him, that Defendants could not/would not tell the court in the BVI the truth about Champ and Ammerman's claims against Hertel for his fraud in inducing them to provide funding for the establishment of IEC and of Visoka and Hertel's fraudulent misrepresentations regarding his credentials and other false information he had provided to Champ and Ammerman to invest in IEC and Visoka.  That is, that Defendants could not (would not) fight back against Hertel's Complaint and his Motion for Summary Judgment because Molino had admonished Jung, although he could continue to deal with Hertel and buy out his stock, if possible, and/or enter into the transaction to oust him through the use of the IEC Resolution, that it was Molino's order to Jung that he was not to take any action that would allow McKinsey's name and reputation and/or that of its "leaders" to be exposed to public obloquy.  In order to defeat Hertel in the BVI court, it would have been necessary for Meroni, using corporate funds of Visoka/Nexim (which funds had come from the German Partner), to set forth the true facts regarding Hertel's fraudulent actions toward them in order for Champ and Ammerman to prevail.  However, Meroni could not allege those facts because they would be embarrassing and damaging to the international reputation of McKinsey. Thus, Defendants allowed the appeal in the BVI court to be dropped at some unknown time and failed to ever tell Champ and Ammerman this fact, and did not tell the German Partner this for a long time afterward, and then lied to him about what had happened.

## COUNT THREE – CONCERT OF ACTION CLAIM
### BY PLAINTIFFS AGAINST ALL DEFENDANTS

61.      Champ and Ammerman reallege the allegations of paragraphs 1-60 and incorporate them by reference as if fully stated here.

62.      Defendants, and each of them, agreed among themselves to engage in a conscious course of conduct to deprive Champ and Ammerman of their legal rights and assets. Defendants made an explicit agreement to work together in order to prevent Champ and Ammerman from establishing control of IEC and their ownership interest in, and control of, Visoka. Each Defendant is, therefore, liable for the conduct of the others whether performed by him or it, because of the agreement among the parties to perform these improper acts.  (This

theory is stated separate and apart from the liability of McKinsey for the actions of its actual or ostensible agents, Jung and Meroni.)

IV.   **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs pray for damages as follows:

1.   For payment of the value of a 70% ownership interest in the Visoka oil field fully developed pursuant to the Petroleum Agreement and the License Agreement, together with damages for fraud and all consequential damages, to be determined by a jury;

2.   For all damages allowed under law for Defendants committing the tort of fraud on each of the Plaintiffs;

3.   Defendants pursued a conscious course of conduct knowing there was a substantial likelihood that serious injuries would be caused to Plaintiffs as a result.  For all of the reasons stated herein, Defendants are, therefore, obligated under the law to pay punitive or exemplary damages to Champ and Ammerman in an amount necessary to punish Defendants and to make an example out of them for their fraud and other outrageously wrongful conduct.

DATED this 1st day of July, 2016.

_____
Pauline Champ, Plaintiff, *in pro per*

_____
Reno Ammerman, Plaintiff, *in pro per*

(Wife and Husband)
7000 N. 16th Street
Suite 120-300
Phoenix, Arizona  85020